UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                              :
CAROL BLACK,                                                  :
                                   Petitioner,                :
                                                              :         20 Civ. 3055 (LGS)
                    -against-                                 :
                                                              :         **OPINION AND ORDER**
THOMAS DECKER, et al.,                                        :
                                   Respondents.               :
                                                              :
------------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

      Petitioner Carol Black, a native and citizen of Jamaica, is a lawful permanent resident of the United States being detained by U.S. Immigration and Customs Enforcement ("ICE") pursuant to 8 U.S.C. § 1226(c) during the pendency of his immigration proceedings.  He filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 and the All Writs Act, 28 U.S.C. § 1651, seeking (1) an injunction prohibiting Respondents from moving Petitioner outside the New York City area while the habeas proceedings are pending; (2) an order directing Respondents to release Petitioner immediately for violation of substantive due process or, in the alternative, provide him with an individualized bond hearing; and (3) in the event of release, an order enjoining Respondents from re-detaining Petitioner pending the culmination of removal proceedings against him, including all administrative or judicial appeals, barring a violation of standard immigration bond terms.  For the reasons stated below, the Petition is granted to the extent that the Court finds that Petitioner is entitled to an individualized bond hearing, in which the Government bears the burden of proving by clear and convincing evidence that Petitioner poses a risk of flight or a danger to the community.  The Petition is denied in all other respects.

## I.   BACKGROUND

### A.   Petitioner Carol Black

Petitioner is a 57-year-old man from Jamaica who has lived in the United States as a lawful permanent residence since 1983.  He is married and lives with his wife and step-daughter.

On March 23, 2000, Petitioner was convicted of sexual abuse in the first degree in violation of New York Penal Law ("NYPL") § 130.65(3), for sexual contact with a minor less than eleven years old, and of endangering the welfare of a child in violation of NYPL § 260.10, for acting in a manner to injure a child less than 17 years-old.  Petitioner was sentenced to five years probation for each conviction.

On December 4, 2019, ICE arrested Petitioner.  Respondents assert that Petitioner's convictions render him removable under 8 U.S.C. § 1227(a)(2)(A)(iii) and § 1227(a)(2)(E)(i), and subject to mandatory detention under INA § 236(c), 8 U.S.C. § 1226(c).  Petitioner is currently detained at the Orange County Jail (the "OCJ").

### B.   Immigration Court Proceedings

Petitioner was taken into custody on December 4, 2019, and served with a Notice to Appear ("NTA").  The NTA was served on the Varick Street Immigration Court on December 6, 2019.  Petitioner and/or his counsel have attended seven master calendar hearings, but Petitioner has not received a bond hearing.

The first master calendar hearing occurred on December 27, 2019.  At that hearing Petitioner requested an adjournment because his counsel was on vacation and unaware of the hearing due to its "abrupt[] schedul[ing]."  The hearing was adjourned to January 13, 2020.

The second master calendar hearing occurred on January 13, 2010.  Prior to that hearing, Petitioner's counsel filed motions for bond and challenging the NTA charge that Petitioner was

removable based on 8 U.S.C. § 1227(a)(2)(A)(iii), arguing that he was not convicted of an aggravated felony as is required for removal under that statute. ICE informed the immigration court that ICE had not received the motions, and the case was adjourned to February 3, 2020, to permit ICE time to respond. The case was then adjourned an additional week at the request of ICE and over Petitioner's opposition, and then *sua sponte* adjourned by the Immigration Judge ("IJ") to February 24, 2020.

At the third master calendar hearing, held on February 24, 2020, the IJ sustained the charges in the NTA, but adjourned the case for further review of the briefing. According to Petitioner, the IJ incorrectly indicated in his initial ruling that the Government's brief was unopposed, and agreed to further review the briefing upon being reminded by Petitioner's counsel of the previously filed brief. Respondents do not dispute this assertion. Petitioner also submitted an application for cancellation of removal at the time of the third hearing.

At the fourth master calendar hearing, held on March 16, 2020,[1] the IJ affirmed the prior ruling, and issued a written order denying Petitioner's request for bond and finding Petitioner to be ineligible for his previously filed application for cancelation of removal because he is detained pursuant to INA § 236(c) and therefore subject to mandatory detention. Petitioner's appeal of this decision is still pending. The IJ further adjourned the case, and directed Petitioner to move for any additional relief by April 20, 2020.

At the fifth master calendar hearing, held on April 20, 2020, Petitioner was directed to file a motion to redetermine by April 27, 2020. Petitioner asserts that his counsel argued that a redetermination was unnecessary, as he sought only to ensure that the arguments and briefs were

---

[1] This hearing was originally scheduled for March 23, 2020, but was moved up at the request of Petitioner.

incorporated into both the bond and removal record. Respondents do not directly address the issue, but assert that Petitioner's counsel argued that the determination was wrongly decided.

At the sixth master calendar hearing, held on May 11, 2020, the IJ gave ICE additional time to respond to Petitioner's motion, as ICE stated it had not received the filing. The IJ also directed Petitioner to email Petitioner's Form I-589 application for asylum to the court, as it had not previously been successfully filed. The IJ adjourned the case to June 8, 2020. On May 22, 2020, Petitioner's request for redetermination was denied.

On June 8, 2020, the IJ adjourned the case until June 29, 2020, to allow time for Petitioner and his counsel to prepare prior to a master calendar hearing to address Petitioner's I-589 application.

Petitioner filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 on April 16, 2020. Petitioner filed an Amended Petition on June 5, 2020, seeking immediate release. On June 22, 2020, the Government filed an opposition and on July 2, 2020, Petitioner filed a reply.

### C.     Petitioner's Medical Condition and Treatment

The following facts are from Petitioner's OCJ medical records and the sworn declaration of Marsha Dixon (the "Dixon Declaration"), a Registered Nurse and the on-site Health Service Administrator of Wellpath Correctional Medical Services, which administers health care services for detainees at OCJ.

Petitioner was detained on December 4, 2019. Upon arrival at the facility, Petitioner underwent a medical intake screening interview, during which Petitioner was asked, *inter alia*, if he had been treated for a heart condition, and whether he had past hospitalizations. Petitioner does not dispute that he answered both questions in the negative. At that time, Petitioner's heart

rate was documented as normal.  At an initial physical assessment on December 5, 2019, Petitioner's heart rate was also documented as normal.

On December 7, 2019, Petitioner complained of chest pain and was seen by a nurse.  His heart rate, respiratory rate and oxygen levels were normal, and an EKG[2] yielded normal results.  He was seen again later that day for chest pain and told the treating physician that a previous consultation with a cardiologist did not reveal a cardiac pathology.  The second examination showed normal heart rate, heart rhythm, oxygen levels and clear lungs.

Two months later, on February 7, 2020, Petitioner complained of heartburn.  On February 9, 2020, Petitioner was examined by a nurse, who found that his heart rate, respiratory rate and oxygen levels were normal, and he was given Tums.

On February 15, 2020, Petitioner complained of chest pain.  On February 16 and 17, 2020, Petitioner was examined by a nurse and a physician, who found that his heart rate, respiratory rate and oxygen levels were normal.  The physician "assessed musculoskeletal chest pain."  An EKG performed on February 17, 2020, "demonstrated borderline intra-atrial conduction delay and was otherwise normal."

On February 27, 2020, Petitioner complained of heartburn and headaches.  On February 28, 2020, Petitioner was examined by medical personnel, who found that his heart rate and oxygen levels were normal, and he was given Tums and Motrin.

A month later, on March 31, 2020, Petitioner complained of chest pain and dizziness.  A nurse examined Petitioner the same day and found high blood pressure and a normal heart rate.

---

[2] According to the Dixon Declaration, an EKG or electrocardiogram "records the heart's electrical impulses to provide information about the sinus rhythm" and "can show that a person is currently having a heart attack and can demonstrate abnormalities including past heart attack(s), abnormal heart rhythm, enlarged heart, inadequate supply of blood or oxygen to the heart, and excessive thickening of the heart's walls."

Petitioner denied lightheadedness, shortness of breath or a family history of cardiac issues. A physician also examined Petitioner the same day and prescribed an antacid and medication to prevent dizziness. An EKG performed the same day found no abnormalities. The physician ordered further blood pressure checks over the next week, leading to further examinations on April 1, 2020 and April 3, 2020. On April 1, 2020, Petitioner was prescribed a medication to treat high blood pressure. By April 3, 2020, Petitioner's blood pressure was stabilized. On April 3, 2020, a physician ordered a chest x-ray, which was conducted on April 6, 2020, revealing no abnormalities.

Petitioner complained of dizziness and chest pain on the following dates: April 11, 12, 16, 17, 20, 23, 24, 25, 27 and 29, 2020. Petitioner was examined by medical practitioners on the following dates: April 12, 17, 18, 20, 21, 25, 27 and 30, 2020. The examinations found normal heart rate and oxygen levels. On April 27, 2020, Petitioner was also given an abdominal ultrasound which yielded normal results.

On May 7, 2020, Petitioner complained of chest pain and dizziness, and on May 8, 2020, was seen by a nurse practitioner. Petitioner reported left-sided chest pain for multiple years that was becoming more frequent with time, dizziness for the past two months, and daily heart palpitations. He denied shortness of breath. An examination revealed normal heart rate, respiratory rate and oxygen levels. A second examination later that day had the same findings. Medical personnel placed an order for a Holter heart monitor, defined as a "small, wearable device that records the electrical activity of a patient's heart, similar to an EKG" that, "[b]ecause [it] is worn over an extended period . . . may provide more information about the patient's heart rhythm than an EKG." The Holter heart monitor had not yet arrived at the time this Petition was briefed.

On May 17 and 26, Petitioner complained of chest pain and dizziness. Examinations conducted on May 18 and 26 found that his heart rate, respiratory rate and oxygen levels were normal. An EKG was also conducted on May 26, 2020, and showed normal results.

On May 29, 2020, Petitioner complained of dizziness, loss of hearing in his left ear, weakness in his left arm and pain in his groin. An examination by medical personnel found mild weakness in his left hand grasp, no facial droop, and normal vital signs and neurological functions. Medical personnel monitored Petitioner's vital signs and neurological functions for the next three days, checking twice daily, and found normal results. An EKG performed on June 1, 2020 also yielded normal results, and no changes from the EKG performed on May 26, 2020. Petitioner's antacid medication was renewed on June 4, 2020.

On June 9, 2020, Petitioner complained of severe stomach cramps and dizziness. He was examined the next day and was found to have a normal heart rate, respiratory rate and oxygen levels. Petitioner reported that he had been experiencing dizziness for the past two months and neck pain for a month, and denied worsening or new symptoms.

On June 20, 2020, Petitioner complained of severe headaches, dizziness, blurriness in his left eye and chest pain. The same day, he was examined by medical staff, and stated he was not experiencing blurred vision, headache or chest pain at that time. His heart rate and respiratory rate were normal.

### D.  COVID-19

The Secretary of Health and Human Services declared a public health emergency on January 31, 2020, as a result of the confirmed cases of COVID-19 in the United States. U.S. Dep't of Health & Human Servs., *Determination that a Public Health Emergency Exists*, Pub. Health Emergency (Jan. 31, 2020), https://www.phe.gov/emergency/news/healthactions/phe/

Pages/2019-nCoV.aspx. On March 13, 2020, the President of the United States declared a national emergency due to the spread of the COVID-19 virus. *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, White House (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/. The first COVID-19 case in the State of New York was confirmed on February 29, 2020. *See* Joseph Goldstein & Jesse McKinley, *Coronavirus in N.Y.: Manhattan Woman is First Confirmed Case in State*, N.Y. Times (Mar. 1, 2020), https://www.nytimes.com/2020/03/01/nyregion/new-york-coronvirus-confirmed.html. As of July 21, 2020, there were 412, 889 confirmed cases in New York State. *See Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last viewed July 21, 2020). Over 32,000 persons have died in New York of the virus and over 141,000 have died nationwide. *Id.*

As of July 21, 2020, there were 10,908 confirmed cases in Orange County, New York and 483 confirmed cases in Goshen, New York (the location of OCJ). *See Orange County NY COVID-19 Cases by Town,* Orange County N.Y. GIS, https://ocnygis.maps.arcgis.com/apps/opsdashboard/index.html#/21de1fb5ce0c480f95dc0cf2b8b83b71 (last viewed July 21, 2020). Per the Dixon Declaration, signed on June 22, 2020, there were no confirmed cases at the OCJ, and no ICE detainees or county inmates at the OCJ who were symptomatic. The OCJ has previously had eight staff members diagnosed with COVID-19; all have since recovered and returned to work after a minimum fourteen-day quarantine.

As of June 17, 2020, the OCJ was at approximately forty-seven percent of its maximum capacity. According to the declaration executed on June 17, 2020 by Colonel Anthony Mele (the

8

"Mele Declaration"), the Correctional Administrator of the Orange County Sheriff's Office who is assigned to the OCJ, the OCJ had implemented, *inter alia*, the following procedures to address the COVID-19 virus: housing each ICE detainee in his own cell; providing meals in detainee cells; screening of incoming detainees and, if necessary, isolation or monitoring; screening of staff members and vendors prior to entrance to the facility; mandatory wearing of masks by all staff and inmates (who have been issued two reusable face masks each); maintenance of an active list of high risk detainees, who are closely monitored; sanitizing the facility and housing units no less than three times per shift, including phones and headsets, and the provision of disinfectant spray, bleach, hand sanitizer, hot water and soap[3] in every housing unit; daily access to sick call, and the placement of posters and educational materials throughout the facility to advise detainees and staff on hygiene protocol and social distancing.

## II.     STANDARD

### A.     Writ of Habeas Corpus

Congress has authorized federal district courts "to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States,'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 224l(c)(3)), including claims by non-citizens challenging their detention without bail. *Demore v. Kim*, 538 U.S. 510, 516-17 (2003).

### B.     Mandatory Detention Under 8 U.S.C. § 1226(c)

Under federal immigration law, "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the

---

[3] Petitioner disputes the availability of soap, asserting that he "regularly does not have access to soap without his own purchase at the commissary."

9

United States." 8 U.S.C. § 1226(a). Certain classes of aliens are subject to mandatory detention under § 1226(c) and may not, under the text of the statute, be released until the removal proceedings conclude. *Jennings v. Rodriguez*, 138 S. Ct. 830, 847 (2018). Aliens subject to mandatory detention include those who have committed certain "crimes involving moral turpitude" as defined by statute, controlled substance offenses, aggravated felonies, firearm offenses, or terrorist activities. *See* 8 U.S.C. §§ 1226(c)(1)(A)-(D). Here, Petitioner is detained under § 1226(c) for having committed an aggravated felony in his violation of NYPL § 130.65(3), for sexual contact with a minor less than eleven years old.

## III.     UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT

### A.     Standard

"In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Charles v. Orange Cty.*, 925 F.3d 73, 85-86 (2d Cir. 2019) (quotation marks and citations omitted) (holding that civil immigration detainees plausibly alleged a Fourteenth Amendment substantive due process claim based on deliberate indifference to medical needs). For a civil detainee to establish such a violation based on deprivation of medical care while in state custody, a claim "must meet two requirements: (1) that Plaintiffs had a serious medical need for discharge planning, and (2) that the Defendants acted with deliberate indifference to such needs." *Id*. at 86.

The first requirement -- a serious medical need -- "contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." *Id*.

> In determining whether a medical need is sufficiently serious to be cognizable as a basis for a constitutional claim for deprivation of medical care, we consider factors such as whether a reasonable doctor or patient would find the injury important and worthy of treatment, whether the medical condition significantly affects an

>individual's daily activities, and whether the illness or injury inflicts chronic and substantial pain. In most cases, the actual medical consequences that flow from the denial of care are highly relevant in determining whether the denial of treatment subjected the detainee to a significant risk of serious harm.

*Id*. (citation omitted).

The second requirement, deliberate indifference, requires a plaintiff to show "something more than mere negligence" or "mere medical malpractice," *id*. at 87, but "does not require proof of a malicious or callous state of mind." *Id*. at 86. Rather, "[d]eliberate indifference . . . can be established by either a subjective or objective standard: A plaintiff can prove deliberate indifference by showing that the defendant official recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to the plaintiff's health or safety." *Id*. at 87 (quotation marks and alteration omitted). Conduct "may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to act . . . that evinces a conscious disregard of a substantial risk of serious harm." *Id.* (alteration in original). "Whether the state knew or should have known of the substantial risk of harm to the detainee is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. . . . A factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (quotation marks and citations omitted).

"The allegations of a return to the writ of habeas corpus or of an answer . . . if not traversed, shall be accepted as true except to the extent that the judge finds from evidence that they are not true." 28 U.S.C. § 2248. "On a petition for a writ of federal habeas corpus, the petitioner bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated." *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997); *accord Grant v.*

11

*Decker*, No. 20 Civ. 2946, 2020 WL 3402445, at *6 (S.D.N.Y. June 19, 2020). "[I]ssuance of the writ is an extraordinary remedy, granted only in the exercise of a sound judicial discretion." *Pinkney v. Keane*, 920 F.2d 1090, 1094 (2d Cir. 1990) (quotation marks and citation omitted); *accord Dzhabrailov v. Decker*, No. 20 Civ. 3118, 2020 WL 2731966, at *3 (S.D.N.Y. May 26, 2020).

    **B.    Discussion**

Petitioner asserts in his Amended Petition (the "Petition") that he "has been diagnosed with Congenital Heart Disease" because doctors "found a hole in his heart, following multiple heart attacks," and that, "[j]ust prior to his arrest by immigration, he was admitted to the Jacobi Medical Center and the New Rochelle Hospital for a hear[t] murmur following severe chest pains and breathing trouble."[4] Petitioner does not dispute that he did not tell medical staff at the OCJ that he suffered from this condition.[5] The Court need not reach the question of whether Petitioner has demonstrated a serious medical need, because Petitioner cannot demonstrate deliberate indifference. Petitioner's request for immediate release is denied on that basis.

Petitioner argues that he has received "inadequate care" and faces "near certain death or serious debilitating complications in a jail environment." Petitioner specifically points to the fact that the OCJ medical team has been "unable to locate [Petitioner's] medical issue," has not

---

[4] Petitioner submits no medical records in support of these claim because "[t]hese hospitals are overrun with COVID-19 cases and are reasonably unable to respond to our requests for information." Petitioner also states that he suffers from "borderline diabetes," but does not explain what this means.

[5] Petitioner states in his reply that "Petitioner mentioned his medical history merely three days after OCJ allegedly brought him through their intake process," but cites to the Declaration of Martha Dixon ("Dixon Declaration") in support, wherein she states that, on December 7, 2019, Petitioner "told the physician [at the OJC] that he had experienced similar [chest] pain in the past two years, approximately 2-3 times per year, that he had consulted with a cardiologist, and that the cardiologist had found no cardiac pathology."

12

performed other types of examinations, "including an echocardiogram or consistent heart monitoring," and has not provided Petitioner with "off-site treatment" or "hospitalization" as is required by ICE guidelines.

But nothing in the record shows that the OCJ medical staff "knew, or should have known," *Charles*, 925 F.3d at 87, of Petitioner's purported congenital heart condition. The OCJ medical records demonstrate that the facility medical staff has consistently and quickly responded to Petitioner's complaints with examinations and that those examinations -- including five EKGs and one chest x-ray -- revealed minor or no abnormalities. Although Petitioner asserts that he "currently believe[s] he may have suffered a small heart attack" while detained, Petitioner's medical records do not support this claim. The records are insufficient to find deliberate indifference on the part of OCJ staff in their treatment of Petitioner where repeated examinations have consistently revealed no abnormalities, and Petitioner does not dispute that he did not tell medical staff at the OCJ about the asserted heart condition. Petitioner's opinion that OCJ medical personnel should have conducted different or additional diagnostic tests or referred him to outside medical specialists does not warrant a contrary conclusion. *See id.* ("A plaintiff must show something more than mere negligence to establish deliberate indifference in the Fourteenth Amendment context. . . . [M]ere medical malpractice is not tantamount to deliberate indifference . . . ." (citation and quotation marks omitted)); *Gutierrez v. Dubois*, No. 20 Civ. 2079, 2020 WL 3072242, at *7 (S.D.N.Y. June 10, 2020) ("While Petitioner has many complaints about the medical care he has received at the Orange County Jail, he has not demonstrated that Jail personnel are deliberately indifferent to his medical needs. Aside from his request for back surgery, Petitioner has not identified any health issue that has gone entirely unaddressed.").

Petitioner argues that the risk caused by the COVID-19 pandemic, in conjunction with his heart condition and "pre-diabetes", "subject him to a heightened risk of harm [which] cannot be adequately addressed if or when he becomes ill." But Petitioner's complaints of chest pain and dizziness alone, where all examinations show no abnormalities, does not mandate the conclusion that Petitioner is at higher risk of death or severe illness from COVID-19. *See People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html (last visited July 22, 2020) (listing, among other medical diagnoses, "people who have serious heart conditions" and "diabetes" as conditions that trigger higher risk of severe illness from COVID-19). But for Petitioner's assertion that he needs to buy his soap from the commissary, Petitioner does not dispute the COVID-19 protocols that OCJ has implemented. Other courts in this District have found these protocols sufficient to show that the facility is not acting with deliberate indifference in its response to the COVID-19 pandemic, and this Court agrees. *See, e.g., Bernal Gutierrez v. Decker*, No. 20 Civ. 4046, 2020 WL 3396283, at *2 (S.D.N.Y. June 10, 2020) (listing the precautions described herein, and finding the OCJ "has taken constitutionally adequate precautions to address the risks Petitioner faces from COVID-19" and that the OCJ "has not been 'deliberately indifferent' to [Petitioner's] medical needs" where Petitioner suffered from Type 2 diabetes); *Gutierrez*, 2020 WL 3072242, at *6 (same); *Dzhabrailov*, 2020 WL 2731966, at *8 (same). Petitioner's single assertion that he needs to buy his soap from the commissary does not mandate a contrary conclusion, nor does Petitioner's speculation that there may be cases of infection that have not been confirmed by testing because "[i]t's hard to imagine that none of [the symptoms of COVID-19] were present throughout the winter/flu season of the past six months."

14

To the extent that Petitioner's habeas application seeks immediate release due to unconstitutional conditions of confinement, the Petition is denied.

Petitioner's request for a bail hearing pursuant to *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001) is also denied. The Second Circuit held in *Mapp* that a Court may grant bail to habeas petitioners when (1) "the habeas petition raises substantial claims" and (2) "extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective." *Mapp*, 241 F.3d at 226 (alterations omitted). As discussed above, the Petition does not raise substantial claims, and no extraordinary conditions associated with this Petition make the grant of bail necessary for the habeas remedy to be effective.

## IV.  UNCONSTITUTIONALLY PROLONGED DETENTION

### A.  Standard

"[T]here must be some procedural safeguard in place for immigrants detained for months without a hearing." *Lora v. Shanahan*, 804 F.3d 601, 614 (2d Cir. 2015), *cert. granted, judgment vacated*, 138 S. Ct. 1260 (2018); *see also Sajous v. Decker*, No. 18 Civ. 2447, 2018 WL 2357266, at *6 (S.D.N.Y. May 23, 2018) ("[U]nder the Second Circuit's case law, the opinion in *Lora* is no longer binding but carries significant persuasive weight."); *Demore*, 538 U.S. at 513 (holding Congress "may require that [noncitizens held under § 1226(c)] be detained for the *brief period necessary* for their removal proceedings" (emphasis added)). "Numerous courts in this Circuit have concluded that aliens subject to mandatory detention under 8 U.S.C. § 1226(c) are entitled to individualized determinations as to their risk of flight and dangerousness when their continued detention becomes unreasonable and unjustified." *Sophia v. Decker*, No. 19 Civ. 9599, 2020 WL 764279, at *3 (S.D.N.Y. Feb. 14, 2020) (quotation marks omitted) (citing cases).

Courts in this District consider a number of factors in determining whether detention is unreasonable and thus a violation of due process. These factors include:

> (1) the length of time the petitioner has been detained; (2) the party responsible for the delay; (3) whether the petitioner has asserted defenses to removal; (4) whether the detention will exceed the time the petitioner spent in prison for the crime that made him removable; (5) whether the detention facility is meaningfully different from a penal institution for criminal detention; (6) the nature of the crimes committed by the petitioner; and (7) whether the petitioner's detention is near conclusion.

*Cabral v. Decker*, 331 F. Supp. 3d 255, 261 (S.D.N.Y. 2018) (drawing factors from various cases in this District); *accord Graham v. Decker*, No. 20 Civ. 3168, 2020 WL 3317728, at *5 (S.D.N.Y. June 18, 2020) (noting that courts in this District have "overwhelmingly adopted" this analysis).

**B.   Discussion**

Petitioner argues that the length of his detention without a bond hearing, which has exceeded seven months, is unconstitutional as applied to him and violates his right to due process. Applying the aforementioned factors, Petitioner's detention without a bond hearing is unreasonable. On that basis, the Petition for a bond hearing is granted.[6]

First, Petitioner has been detained for over seven months without an individualized bond hearing. "As a rule of thumb, courts applying the multi-factor analysis have regarded detentions exceeding six months without a bond hearing as favoring the finding of a due process violation." *Graham*, 2020 WL 3317728, at *5. Specifically, courts in this District have found a seven-month detention sufficient to show a due process violation. *See, e.g.*, *Sophia*, 2020 WL 764279,

---

[6] Petitioner requests that the Court conduct the bond hearing, but cites *Celestin v. Decker*, Case No. 17 Civ. 2419, filed in the Southern District of New York on April 17, 2017, where the Court granted the petitioner's writ of habeas corpus and directed that a bond hearing be held before an IJ. Only after the bond hearing did the District Court conduct another hearing at which the issue of bond was discussed.

at *4 (seven months); *Cabral*, 331 F. Supp. 3d at 261 (same); *Alberto v. Decker*, No. 17 Civ. 2604, 2017 WL 6210785, at *7 (S.D.N.Y. Nov. 21, 2017) (same); *Morris v. Decker*, No. 17 Civ. 2224, 2017 WL 1968314, at *5 (S.D.N.Y. May 11, 2017) (same). This factor weighs in favor of Petitioner.

Second, Petitioner has not unreasonably delayed the proceeding. Respondents point to the first hearing, which was adjourned two weeks to permit attendance by Petitioner's counsel, but Respondents do not dispute Petitioner's assertion that the first hearing, scheduled for December 27, 2019, was scheduled "abruptly," weeks after Petitioner's detention on December 4, 2019, after Petitioner's counsel had already left for a holiday vacation. Otherwise, to the extent that Petitioner's actions have caused any delay, it is only as a result of his efforts to obtain relief from removal. *See Hernandez v. Decker*, No. 18 Civ. 5026, 2018 WL 3579108, at *9 (S.D.N.Y. July 25, 2018) ("[P]ursuit of relief from removal does not, in itself, undermine a claim that detention is unreasonably prolonged."); *Sophia*, 2020 WL 764279, at *4 (finding this factor to weigh in favor of petitioner where "[t]he record indicates that the length of his detention is primarily due to his efforts to ensure that he could proceed with legal counsel, his compliance with the Immigration Judge's schedule, and his decision to appeal the final decision concluding that the DHS had established removability."). Respondents' argument that there is no evidence that the immigration court or immigration officials were responsible for undue delay is unpersuasive; "detention can be unconstitutionally unreasonable even when the Government did not intentionally cause the length and conditions of detention to reach an untenable limit." *Sophia*, 2020 WL 764279, at *4. This second factor also weighs in favor of Petitioner.[7]

---

[7] *Doherty v. Thornburgh*, 943 F.2d 204, 211 (2d Cir. 1991) does not mandate a different holding, as the petitioner there had already received a bond hearing, had been found to be "an

The third, fourth and fifth factors also weigh in favor of Petitioner: Petitioner is asserting defenses to his removal. *Sajous*, 2018 WL 2357266, at *11 ("The Court need not inquire into the strength of these defenses -- it is sufficient to note their existence and the resulting possibility that the [p]etitioner will ultimately not be removed, which diminishes the ultimate purpose of detaining the [p]etitioner pending a final determination as to whether he is removable."). Petitioner was also sentenced to probation for the crimes that ICE asserts renders Petitioner removable, and Petitioner is detained at a penal institution -- the Orange County Correctional Facility. *See Graham*, 2020 WL 3317728, at *7 (S.D.N.Y. June 18, 2020) (finding the fourth and fifth factors to weigh in favor of petitioner where petitioner's current detention had lasted twice as long as the sentence he received for his past crimes, and he was being detained in Orange County Jail).

The sixth factor -- the nature of the underlying crime -- weighs in favor of Respondents.

Finally, the seventh factor weighs in favor of Petitioner because it is unclear when Petitioner's detention will conclude.

In light of these factors, Petitioner's continued detention without an individualized bond hearing violates his due process rights. Petitioner is entitled to an individualized bond hearing before an IJ to determine whether he is a flight risk or poses a danger to the community such that continued detention is warranted. *See Graham*, 2020 WL 3317728, at *7 ("At bottom, the minimal burden that a bond hearing would place on the Government is far outweighed by

---

exceptionally poor bail risk", *id.*, and to be purposefully slowing the removal process, which is not the case here.

[Petitioner's] interest in ensur[ing] that his continued detention is justified." (quotation marks omitted)).[8]

### C. Procedural Requirements of Bond Hearing

The burden at the bond hearing is on the Government to justify by clear and convincing evidence that Petitioner poses a risk of flight or a danger to the community. *See Graham*, 2020 WL 3317728, at *8 ("The overwhelming majority of courts have concluded, post-*Jennings*, that when unreviewed detention has become unreasonable, the government must bear the burden of proof at a bond hearing by clear and convincing evidence, to ensure the preservation of the detainees' fundamental liberty interests." (quotation marks omitted)). "[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979). This includes mandatory detention under § 1226(c). *See Hernandez*, 2018 WL 3579108, at *11 (finding, in the context of detention under § 1226(c), that "pursuant to *Lora*, [] imposing a clear and convincing standard would be most consistent with due process"). In considering the issue, the IJ must also consider Petitioner's ability to pay and the availability of alternative means of assuring his appearance. *See id.* at *12; *Graham*, 2020 WL 3317728, at *8. "These two procedural safeguards -- a clear and convincing standard of proof, and consideration of the ability to pay and conditions of release -- are the two conditions most often ordered as constitutionally necessary." *Sophia*, 2020 WL

---

[8] Respondents also argue that detention is beneficial because it ensures aliens appear at hearings and protects the community from aliens who have already committed serious crimes. This argument is more appropriate at the bond hearing itself. *See Sophia*, 2020 WL 764279, at *4 (observing, in response to the same argument, that "[t]he Government will have an opportunity to argue at the bond hearing that these interests, when applied to Petitioner, warrant denying his release.").

19

764279, at *5 (citing *Sanchez v. Decker*, 18 Civ. 8798, 2019 WL 7047328, at *5-6 (S.D.N.Y. Dec. 23, 2019) (collecting cases)).

## V.    CONCLUSION

For the foregoing reasons, Petitioner's request for a Writ of Habeas Corpus is GRANTED in part. By **August 6, 2020**, Respondents shall provide an individualized bond hearing to Petitioner to determine whether his detention is justified. Should they fail to provide such a hearing, Respondents shall release Petitioner from detention. The Government shall file a status letter to update the Court about Petitioner's status by **August 7, 2020**.

The Clerk of Court is respectfully requested to close this case.

**SO ORDERED.**

Dated: July 23, 2020
New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**